UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION
flnb@uscourts.gov

In re:

                                            Chapter 11

CYPRESS HEALTH SYSTEMS FLORIDA,
INC., d/b/a TRI COUNTY HOSPITAL –
WILLISTON, f/d/b/a NATURE COAST
REGIONAL HOSPITAL,

                                            Case No. 1:12-bk-10431-KSJ

        Debtor.
_____/

**EMERGENCY MOTION FOR ORDER AUTHORIZING AND
DIRECTING MEDICARE TO DISBURSE COST REPORT RECEIVABLES**

       Debtor, CYPRESS HEALTH SYSTEMS FLORIDA, INC., by and through its

undersigned attorneys, hereby files its Motion for Order Authorizing and Directing Medicare to

Disburse Cost Report Receivables (the "**Motion**") and, in support of this Motion, states as

follows:

**<u>Background</u>**

       1.      On October 5, 2012, the Debtor filed with the Court its Voluntary Petition for

relief under Chapter 11 of the Bankruptcy Code.

       2.      On April 3, 2013, the Debtor filed with the Court its Plan of Liquidation under

Chapter 11 of Title 11, United States Code dated as of April 3, 2013 [Doc. No. 242] (the

"**Plan**").

       3.      On June 14, 2013, the Court entered its Order (I) Approving Debtor's Disclosure

Statement on a Final Basis and (II) Confirming Debtor's Plan of Liquidation under Chapter 11 of

the United States Bankruptcy Code [Doc. No. 347] (the "**Confirmation Order**").    The Confirmation Order confirmed the Plan, as modified (the "**Modified Plan**"), in all respects.

4.    The effective date of the Modified Plan (the "**Effective Date**") occurred on August 14, 2013 [*see* Doc. No. 360].

5.    On August 14, 2013, the Debtor also consummated the sale of substantially all of its assets to Regional Health Partners, LLC  ("**Regional**") pursuant to the terms of that certain Asset Purchase Agreement dated as of March 5, 2013 (the "**Purchase Agreement**") between the Debtor and Regional (the "**Closing**").  A copy of the Purchase Agreement (without the attendant Schedules) is attached hereto as <u>Composite Exhibit A</u>.

### Relief Requested

6.    The Purchase Agreement provided for the sale by the Debtor and the purchase by Regional of certain assets of the Debtor as described in Section 2.1 of the Purchase Agreement (collectively, the "**Purchased Assets**").  The Purchased Assets did not include any "Excluded Assets", as that term is defined in Section 2.2 of the Purchase Agreement.  The Excluded Assets remain the property of the Debtor and its bankruptcy estate.

7.    The Excluded Assets that are property of the Debtor pursuant to the express terms of the Purchase Agreement include amounts due to the Debtor with respect to the pre-Closing cost reports of the Debtor.

8.    Sections 2.2(a) and (i) of the Purchase Agreement provide, in pertinent part, as follows:

> "**2.2    Excluded Assets**.  Notwithstanding anything to the contrary contained herein, the following items which are related to the Assets are not intended by the parties to be a part of the sale and purchase contemplated hereunder and are excluded from the Assets (collectively, the "<u>Excluded Assets</u>"), and shall be retained by Seller:

(i)    the rights to settlements and retroactive adjustments, if any, whether arising under any Seller Cost Report, whether open or closed, arising from or against the United States government or any state government under the terms of the Medicare, Medicaid and TRICARE programs, and against any third-party payor programs which settle upon a basis other than an individual claims basis ("**Cost Report Receivables**") . . . .

9.    In addition, the third sentence of Section 6.2 of the Purchase Agreement provides as follows: "Seller shall retain all rights to agency settlements and to Seller Cost Reports including any amounts receivable or payable in respect of such reports or reserves relating to such reports."

10.    On information and belief, approximately Four Hundred Thousand Dollars ($400,000.00) in Cost Report Receivables are due and owing and, having not yet been disbursed, are being held by Medicare.  Pursuant to the terms of the Purchase Agreement, the Cost Report Receivables are property of the Debtor's estate and should be remitted to it.

11.    The Debtor requests, therefore, entry of an order authorizing and directing Medicare to remit the Cost Report Receivables to the law firm of Stichter, Riedel, Blain & Prosser, P.A. ("**SRBP**").  The Debtor further requests Regional be directed to cooperate in remittance of the funds for the Debtor with Medicare.

12.    In the event any portion of the Cost Report Receivables have been received by Regional, the Debtor requests Regional be directed to immediately remit any and all amounts to SRBP.

13.    The Debtor requests Regional be ordered to reimburse the Debtor's estate for all attorney's fees and costs incurred in connection with seeking recovery of the Cost Report Receivables for the Debtor's estate.

WHEREFORE, the Debtor respectfully requests that this Court enter an order providing the relief requested herein and for such other and further relief as is just and proper.

DATED:  June 6, 2014

/s/ Elena P. Ketchum
Elena P. Ketchum
Florida Bar No. 129267
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
(813) 229-0144
(813) 229-1811 FAX
eketchum@srbp.com
ATTORNEYS FOR DEBTOR

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing **EMERGENCY MOTION FOR ORDER AUTHORIZING AND DIRECTING MEDICARE TO DISBURSE COST REPORT RECEIVABLES** has been furnished by **CM/ECF Transmission** on this **6**[rd] day of **June, 2014** to:

All parties receiving notice via CM/ECF Transmission

and by **U.S. Mail** (without Composite Exhibit A) and **E-Mail Transmission** to:

Davie Lloyd, Chief Executive Officer
Regional Health Partners, LLC
125 SW 7th Street
Williston, Florida 32696
dlloyd@regionalgeneral.com

Regional Health Partners, LLC
c/o Mohammad J. Tariq, M.D.
1850 Lake Pointe Drive – Suite 100
Lewisville, Texas 75057
painmgmt@hotmail.com

Jennifer L. Graul, Esquire
JENNIFER L. GRAUL, P.C.

1006 Quail Run Road – Suite 100
Southlake, Texas 76092
graulj@jlgraullaw.com

John H. Carney
One Meadows Building
5005 Greenville Avenue – suite 200
Dallas, Texas 76206
jhcblue@aol.com

/s/ Elena P. Ketchum
Elena P. Ketchum
Florida Bar No. 129267

# COMPOSITE

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

by and between

**CYPRESS HEALTH SYSTEMS FLORIDA, INC.**

as Seller

and

**REGIONAL HEALTH PARTNERS, LLC**

as Buyer

**Dated as of March 5, 2013**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of March 5, 2013, by and between **REGIONAL HEALTH PARTNERS, LLC**, a Florida limited liability company ("Buyer") and **CYPRESS HEALTH SYSTEMS FLORIDA, INC.**, a Florida corporation ("Seller"). Each of the Seller and Buyer is a "Party" and collectively they are the "Parties" to this Agreement.

### RECITALS:

**WHEREAS**, Seller owns and operates a 40-bed general acute care hospital and outpatient services facility located at 125 SW 7th Street, Williston, Florida 32696, operating as Tri County Hospital - Williston, and other related real and personal property located in Williston, Florida (the "Hospital");

**WHEREAS**, on October 5, 2012 (the "Petition Date"), Seller commenced a voluntary case for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Florida, Gainesville Division (the "Bankruptcy Court"), which case was assigned Case No. 12-10431-KKS (the "Bankruptcy Case");

**WHEREAS**, since the Petition Date, Seller has been in possession of its assets and in control of its business operations as a debtor in possession pursuant to the applicable provisions of the Bankruptcy Code;

**WHEREAS**, Seller desires to sell the Assets (as hereinafter defined) to a buyer who desires to continue to furnish Levy County, Florida and the surrounding counties with a general acute care hospital and outpatient services facility and rural health clinic;

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain of the assets, real, personal and mixed, tangible and intangible, associated with or employed in the operations of the Hospital and owned by Seller, and Buyer agrees to assume certain of the obligations of Seller from and after the Closing, on the terms and conditions set forth in this Agreement and in accordance with §§ 105, 363 and 365 and other applicable provisions of the Bankruptcy Code (the "Transaction");

**WHEREAS**, Bankruptcy Court approval shall be required to consummate the Transaction;

**WHEREAS**, the Assets and the Assumed Liabilities (as hereinafter defined) include assets and liabilities of Seller which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale (the "Sale Order") pursuant to §§ 105, 363 and 365 of the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which order shall include the authorization for the assumption by Seller of certain executory contracts and unexpired leases and the assignment of such

1

executory contracts and unexpired leases to Buyer pursuant to § 365 of the Bankruptcy Code; and

**WHEREAS**, the Parties intend to consummate the sale contemplated by this Agreement, subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code, pursuant to the Plan of Liquidation (as hereinafter defined).

**NOW, THEREFORE**, for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Definitions.**    Capitalized terms used in this Agreement shall have the following meanings:

"Accounts Payable" shall mean any and all accounts payable, accrued, incurred or created in the operation of the Hospital on and after the Petition Date and outstanding as of the Effective Time.

"Accounts Receivable" means all accounts and notes receivable of the Hospital existing at the Effective Time, including any accounts and notes receivable that have been charged off as bad debts, and any other evidence of indebtedness of and rights to receive payments from any Person arising from the rendering of services to patients at the Hospital, billed and unbilled, recorded or unrecorded, with collection agencies or otherwise, accrued and existing in respect of services rendered up to the Closing.

"Accrued PTO" means obligations and liabilities to Hospital employees in respect of accrued but unused paid time off, including employee payables that consist of accrued vacation, holidays and sick leave of employees, as of the Effective Time with respect to Hospital employees who commence employment with Buyer after the Effective Time.

"Administrative Claim" means (a) any cost or expense of administration of the Bankruptcy Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Case on or before the applicable bar date, including (i) any actual and necessary costs and expenses of preserving the Estate or operating the business of the Seller (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Seller in the ordinary course of its business, (iii) any claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any claim by a governmental unit for taxes (and for interest and/or penalties related to such taxes) due from the Seller for any Postpetition tax year or period, and

2

(v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code; (b) all fees and charges assessed against the Estate under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (c) any and all other costs or expenses of administration of the Bankruptcy Case that are allowed by a Final Order of the Bankruptcy Court.

"Affiliate" means, with respect to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venture or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Affiliate Receivables" has the meaning set forth in Section 2.2(e).

"Agreement" means this Asset Purchase Agreement (together with all Exhibits and Schedules attached hereto) as the same may from time to time be amended, modified or supplemented in accordance with the terms hereof.

"AHCA" has the meaning set forth in Section 2.3(e).

"Allocation" has the meaning set forth in Section 2.5(b).

"Allowed Tax Claims" has the meaning set forth in Section 2.3(f).

"Assets" has the meaning set forth in Section 2.1.

"Assigned Causes of Action" means Causes of Action (i) with respect to or arising out of any Assumed Contract; and (ii) arising with respect to property, plant or equipment included in the Assets, whether as a result of a warranty or otherwise.

"Assignment" has the meaning set forth in Section 3.2(i).

"Assumed Contracts" means all rights and interests of Seller in the Contracts listed on Schedule 1.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" has the meaning set forth in Section 3.2(j).

"Avoidance Actions" means any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of Seller or the bankruptcy estate of Seller under Chapter 5 of the Bankruptcy Code, including actions under

one or more provisions of §§ 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" has the meaning set forth in the Recitals.

"Benefit Plans" means "employee benefit plans," as defined in § 3(3) of ERISA, all benefit plans as defined in § 6039D of the Code and the rules and regulations promulgated thereunder, and all other stock purchase, stock option, equity-based, retention bonus, bonus, incentive compensation, deferred compensation, profit sharing, severance, change in control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, welfare and other employee benefit plans (whether oral or written, qualified or non-qualified) and employment agreements, programs, policies or other arrangements and any trust, escrow or other funding arrangement related thereto.

"Bill of Sale" has the meaning set forth in Section 3.2(c).

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in the State of Florida are required or permitted by law to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Loan Obligations" means all amounts owing by the Seller to the Buyer as of the Closing Date on account of (a) advances pursuant to loan documents prior to the Petition Date and (b) advances made by Buyer to Seller in Seller's bankruptcy case pursuant to § 364 of the Bankruptcy Code, in each case together with interest and other charges accrued thereon.

"Cash Payment" has the meaning set forth in Section 3.3(a).

"Causes of Action" means any and all claims, demands, rights, defenses, counterclaims, suits or actions and all other claims of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof.

"Claim" has the meaning set forth in §101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.1.

4

"Closing Costs" means all fees and costs due to any third parties in connection with the Closing hereunder.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Statement" has the meaning set forth in Section 2.7(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means all information of any kind concerning Seller or the Hospital, obtained directly or indirectly from Seller or its Affiliates in connection with the transactions contemplated by this Agreement except information (a) ascertainable or obtained from public or published information, (b) received from a third party not known by Buyer to be under an obligation to Seller to keep such information confidential, (c) which is or becomes known to the public (other than through a breach of this Agreement), or (d) which was in Buyer's possession prior to disclosure thereof to Buyer in connection herewith.

"Contracts" means all commitments, contracts, leases, subleases, licenses, sublicenses and other agreements of any kind relating to the Hospital, the Assets or the operation thereof to which Seller is a party or by which any of the Assets are bound.

"Cost Report Receivables" has the meaning set forth in Section 2.2(i).

"Cure Amounts" means the amounts, if any, determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts.

"Deed" has the meaning set forth in Section 3.2(a).

"Effective Time" has the meaning set forth in Section 3.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"Excluded Accounts Receivable" means all Accounts Receivable which became due prior to December, 2010.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts not listed on Schedule 1.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Final Order" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or

by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, re-argument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

"Governmental Authority" means the government of the United States and any government of a state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, any state of the United States or any political subdivision thereof, any tribunal or arbitrator(s) of competent jurisdiction and any self - regulatory organization.

"Higher Auction Transaction" has the meaning set forth in Section 8.2.

"Hospital" has the meaning set forth in the Recitals.

"Initial Upset Bid" has the meaning set forth in Section 6.1(b).

"Inventory" means inventories of usable supplies, drugs, food, janitorial and office supplies and other disposables and consumables existing at the Effective Time and located at the Hospital or purchased by Seller for use in connection with the Hospital.

"Law" means any statute, rule, regulation, code, ordinance, resolution, Order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority.

"Lien" means any mortgage, pledge, hypothecation right of offer, Claim, occupancy agreement, covenant, encroachment, burden, title defect, voting trust agreement, right of first refusal, charge, assessment, security interest, lease, sublease, lien, right of set-off, right of recoupment, adverse claim, levy, charge, easement (or other matter which would affect title to the Real Property or the use or possession thereof or otherwise be disclosed by an ALTA/ACSM Land Title Survey, including all optional items from Table A), restriction, license or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other contract to give or to refrain from giving any of the foregoing.

"Order" means a judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority.

"Perkins State Bank Claim" has the meaning set forth in Section 2.3(a).

"Permitted Encumbrances" means (i) lease obligations that are Assumed Contracts, (ii) Assumed Liabilities, and (iii) items listed on the Title Commitment and approved in writing by Buyer.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or government (whether federal, state, county, city or otherwise, including, without limitation, any instrumentality, division, agency or department thereof).

"Personal Property" means all tangible and intangible personal property used or held for use in connection with the Hospital, including all equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, spare parts, and, to the extent assignable or transferable by Seller, all rights in all warranties of any manufacturer or vendor with respect thereto.

"Petition Date" has the meaning set forth in the Recitals.

"Plan of Liquidation" means the confirmed plan of liquidation of Seller in the Bankruptcy Case.

"PMATF Tax" means the Public Medical Assistance Trust Fund tax imposed on net revenue by the State of Florida.

"Postpetition" means arising or accruing on or after the Petition Date.

"Preamble" means the first paragraph of this Agreement.

"Prepaid Expenses" means expenses that are paid in cash and recorded as assets before they are used or consumed, excluding deposits.

"Proceeding" means any arbitration, audit, hearing, investigation, litigation suit or other similar action by or before a Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.5.

"Real Property" means all fee, leasehold and other interests in real property owned by Seller, whether directly or indirectly, or otherwise used or held for use in connection with the Hospital, together with all buildings, improvements and fixtures and construction in progress located thereupon and all appurtenances, rights of way and air, mineral or other rights related thereto. The legal description of the Real Property is attached hereto as Schedule 2.

"Sale Motion" has the meaning set forth in Section 6.1(a).

"Sale Order" has the meaning set forth in the Recitals.

"Sale Procedure Motion" has the meaning set forth in Section 6.1(a).

"Schedules" means the disclosure Schedules to this Agreement.

"Seller" has the meaning set forth in the Preamble.

"Seller Cost Report" has the meaning set forth in Section 6.2.

"Taxes" means (i) any and all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, ad valorem, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (ii) any liability for payment of amounts described in clause (i) as a result of transferee liability or otherwise through operation of law, and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person.

"Termination Fee" has the meaning set forth in Section 10.2.

"Title Agent" has the meaning set forth in Section 8.5.

"Title Commitment" has the meaning set forth in Section 8.5.

"Title Policy" has the meaning set forth in Section 8.5.

"Transaction" has the meaning set forth in the Recitals.

"Transaction Documents" means this Agreement, and all other agreements and instruments executed and delivered by the respective parties in connection with this Agreement.

"Transferred Employees" has the meaning set forth in Section 7.5.

"Transfer Taxes" means any and all sales, use, real property transfer, recording, documentary, stamp, registration, or other transfer Taxes payable by reason of the transfer and conveyance of the Assets to the Buyer hereunder.

"Unsecured Creditor Payments" has the meaning set forth in Section 2.5(a)(vi).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109.

## ARTICLE II
## SALE OF ASSETS, PURCHASE PRICE AND CERTAIN RELATED MATTERS

**2.1    Sale of Assets.**  Subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing, Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase from Seller, all assets, real, personal and mixed, tangible and intangible, associated with or employed or held for use in the operations of the Hospital other than the Excluded Assets (collectively, the "Assets"), free and clear of all Liens except Permitted Encumbrances. Without limiting the foregoing, the Assets shall include the following:

(a)    the Real Property;

(b)    the Personal Property, including, but not limited to those items of personal property identified in Schedule 3;

(c)    all of Seller's Accounts Receivable (excluding the Excluded Accounts Receivables) including, without limitation, receivables from governmental third party payors to the extent transferable under applicable Law (including the Bankruptcy Code);

(d)    the Assumed Contracts and Assigned Causes of Action;

(e)    Prepaid Expenses and deposits related to Assumed Contracts or other Assets;

(f)    all Inventory, except as provided in Section 2.2(c);

(g)    all documents, records, operating manuals and files, and computer software owned or licensed by Seller, pertaining to or used in connection with the Hospital, including all patient records, medical records, personnel records, financial records, equipment records, construction plans and specifications, medical and administrative libraries, but excluding Seller's corporate record books, minute books, tax records and, where prohibited by law, restricted patient and medical records;

(h)    Seller's rights to the name "Tri County Hospital" and Seller's rights, if any, to all variations thereof; all patents, patent applications, trade names, trademarks, service marks, trade secrets, copyrights and other intellectual property owned by Seller; and all of Seller's rights to use all patents, patent applications, trade names, trademarks, service marks, trade secrets, copyrights and other intellectual property of other Persons;

(i)    Seller's insurance proceeds on any Assets damaged by fire or other casualty prior to the Effective Time; and

(j)    except as expressly excluded above or otherwise included in the Excluded Assets (as hereinafter defined), all other property owned by Seller, whether tangible or intangible, located at the Hospital or used in connection with the Hospital whether or not

9

reflected on the balance sheet of Seller (including any claims against third parties by Seller relating to the Assets whether known or unknown, contingent or otherwise).

2.2    **Excluded Assets.** Notwithstanding anything to the contrary contained herein, the following items which are related to the Assets are not intended by the parties to be a part of the sale and purchase contemplated hereunder and are excluded from the Assets (collectively, the "Excluded Assets"), and shall be retained by Seller:

(a)    restricted and unrestricted cash and cash equivalents, including cash, cash accounts, insurance policies or programs, marketable securities and certificates of deposit, deposits made with respect to Contracts that are not Assumed Contracts or other Excluded Assets, and utility deposits;

(b)    all of Seller's Excluded Accounts Receivable including, without limitation, receivables from governmental third-party payors to the extent transferable under applicable Law (including the Bankruptcy Code) which constitute Excluded Accounts Receivable.

(c)    all Inventory not owned by Seller or that is disposed of or exhausted prior to the Effective Time in the ordinary course of business;

(d)    all items of Personal Property not owned by Seller or that are transferred or disposed of prior to the Effective Time in the ordinary course of business;

(e)    all amounts due to Seller from any Affiliate of Seller (the "Affiliate Receivables");

(f)    all assets, rights and funds in connection with any Benefit Plan;

(g)    all rights (i) under any insurance policies of the Seller, and any right to refunds due and/or cash surrender values with respect to such insurance policies, except as otherwise provided in Section 2.1(i) with respect to insurance proceeds received in the event of a fire or other casualty, and (ii) under or pursuant to all warranties (express or implied), representations and guarantees made or provided by third parties relating to any Excluded Assets;

(h)    the Excluded Contracts;

(i)    the rights to settlements and retroactive adjustments, if any, whether arising under any Seller Cost Report, whether open or closed, arising from or against the United States government or any state government under the terms of the Medicare, Medicaid and TRICARE programs, and against any third-party payor programs which settle upon a basis other than an individual claims basis ("Cost Report Receivables");

(j)    Seller's Medicare, TRICARE and other governmental third party payor provider agreements and any associated provider numbers;

(k)     Seller's corporate record books, minute books and tax records, and any other records which Seller is required to retain by Law (copies of which shall be given to Buyer), but only to the extent that such books and records cannot be transferred to Buyer if Buyer agrees to grant Seller access to such books and records and to maintain them for the period required by Law;

(l)     all of Seller's Causes of Action (other than Assigned Causes of Action), Avoidance Actions and Seller's claims or causes of action for professional negligence and director and officer liability; and

(m)     all rights of Seller under this Agreement and its related documents.

**2.3    Assumed Liabilities.** As of Closing, Buyer agrees to assume the future payment and performance of the following liabilities and obligations of Seller (collectively, the "Assumed Liabilities"):

(a)     any and all secured indebtedness due to Perkins State Bank, as allowed by a Final Order of the Bankruptcy Court (the "Perkins State Bank Claim"), as provided in Section 2.5(a);

(b)     any and all Taxes related to the Real Property due to the Levy County, Florida taxing authority, as provided in Section 2.5(a);

(c)     any and all liabilities arising from the Assumed Contracts from and after the Closing including any Cure Amounts, all of which shall be satisfied by Buyer pursuant to § 365 of the Bankruptcy Code;

(d)     any and all liabilities for Accrued PTO;

(e)     any and all liabilities due to the State of Florida Agency for Health Care Administration ("AHCA"), including, without limitation, amounts due to the Public Medical Assistance Trust Fund for PMATF Taxes, Medicaid and other liabilities to AHCA that Buyer is legally obligated to assume;

(f)     any and all liabilities for any and all Taxes and any related interest, fines, costs or penalties due to any federal or state taxing authority, as allowed by a Final Order of the Bankruptcy Court (the "Allowed Tax Claims") and in an amount and subject to payment terms as approved by the Buyer;

(g)     any and all Administrative Claims as allowed by an order of the Bankruptcy Court;

(h)     any and all amounts owed to Transferred Employees of the Hospital who are owed, or had accrued in their favor, various sums for compensation, wages, salaries and attendant payroll taxes for payroll periods which occurred either prior to the Petition Date or Postpetition and remain unpaid as of the Effective Time;

11

(i)    any and all Accounts Payable;

(j)    any and all Closing Costs;

(k)    any and all Transfer Taxes; and

(l)    any and all liabilities and obligations in connection with the Assets or the operation of the Hospital from and after the Closing.

    **2.4**    **Excluded Liabilities**.  It being expressly agreed that the sale of the Assets shall be free and clear of all Liens to the fullest extent of § 363 of the Bankruptcy Code, <u>except as expressly provided to the contrary in Section 2.3 above</u>.  To the extent there is any inconsistency or conflict between the provisions of this <u>Section 2.4</u> and the provisions of <u>Section 2.3</u>, the provisions of <u>Section 2.3</u> shall control.  Under no circumstance shall Buyer be obligated to pay or assume, and none of the Assets shall be or become liable for or subject to, any liability of Seller and/or its Affiliates, whether fixed or contingent, recorded or unrecorded, known or unknown, and whether or not set forth on the Schedules hereto, except for the Assumed Liabilities, including the following (collectively, the "<u>Excluded Liabilities</u>"):

    (a)    any obligation or liability accruing, arising out of, or relating to acts or omissions of any Person in connection with the Assets or the operation of the Hospital prior to the Closing;

    (b)    any obligation or liability accruing, arising out of, or relating to any act or omission by Seller, any of its Affiliates or any of their respective employees, medical staff, agents, vendors or representatives, prior to the Closing;

    (c)    any obligation or liability accruing, arising out of, or relating to any Excluded Contract;

    (d)    any liability or obligation for severance (except for Accrued PTO and accrued wages and salaries of Seller employees who accept employment with Buyer) with respect to employees of Seller or its Affiliates;

    (e)    any obligation or liability accruing, arising out of, or relating to any federal, state or local investigations, claims or actions with respect to acts or omissions (or suspected or alleged acts or omissions) of Seller, any of its Affiliates or any of their respective employees, medical staff, agents, vendors or representatives prior to the Closing;

    (f)    any civil or criminal obligation or liability accruing, arising out of, or relating to any acts or omissions of Seller, any of its Affiliates, or any of their respective directors, officers, employees and agents claimed to violate any Laws;

    (g)    any liabilities of Seller or any of its Affiliates for (i) lease obligations and other similar liabilities or guarantees of Seller, (ii) indebtedness for borrowed money, and (iii)

accounts payable and other current liabilities, except to the extent such accounts payable and current liabilities are expressly assumed by Buyer in accordance with <u>Section 2.3</u>;

(h)    any liabilities or obligations of Seller or any of its Affiliates of every kind and nature, known and unknown, arising under the terms of the Medicare, TRICARE or any other third-party payor programs or health insurers, in respect of, arising out of or as a result of (i) periods prior to and up to the Closing, and (ii) the consummation of the transactions contemplated hereby, including claims, setoffs or recoupments for overpayments or other excessive reimbursement or non-covered services or any penalties or sanctions relating thereto;

(i)    except to the extent such liabilities are expressly assumed by Buyer in accordance with <u>Section 2.3</u>, any liability with respect to Seller's employees relating to periods prior to the Closing, including liability for (A) any compensation, benefits, pension, profit sharing, deferred compensation, or any other employee health and welfare benefit plans, paid time off, liability for any Equal Employment Opportunity Commission claim, wage and hour claim, unemployment compensation claim or workers' compensation claim or personnel policy, including those relating to any termination of employment, and all employee wages and benefits, or (B) any payroll taxes; or (ii) any liability arising under the WARN Act;

(j)    liabilities for expenses incurred by Seller incidental to the preparation of this Agreement, the preparation or delivery of materials or information requested by Buyer, or the consummation of the transactions contemplated hereby, including all broker, counsel and accounting fees or any account payable which is attributable to legal and accounting fees and similar costs incurred by Seller which are directly related to the sale of any of the Assets, except for Administrative Claims expressly assumed by Buyer in accordance with <u>Section 2.3</u>;

(k)    liabilities arising from or in connection with (i) any Order of any Governmental Authority, (ii) the violation of any Law, or (iii) the violation of any Medicare, Medicaid or TRICARE program integrity or compliance agreement involving Seller or relating to or arising in connection with the use, operation, ownership or possession of the Assets;

(l)    liabilities attributable to any of the Excluded Assets; and

(m)    any other liability, fixed or contingent, known or unknown, relating to or arising out of the ownership, operation or use of the Hospital or the Assets prior to the Closing, except as assumed by Buyer in accordance with <u>Section 2.3</u>.

**2.5    Purchase Price**

(a)    The consideration to be paid by Buyer to Seller for the Assets (the "Purchase Price") shall be the sum determined on the Closing Date consisting of the following items:

i)    by credit against amounts owing to Buyer with respect to the Buyer Loan Obligations;

13

ii)     the assumption and/or payment of the Perkins State Bank Claim as follows:

> assumption by Buyer of the note and deed of trust secured by the Real Property and the extension of the existing payment terms for the first and second lien mortgage for an additional term of five (5) years.

iii)     the assumption and/or payment of the Allowed Tax Claim as follows:

> payment of Allowed Tax Claims over a sixty (60) month period and agreement to such treatment by the applicable taxing authority.

iv)     the payment of Allowed Administrative Claims as follows:

> payment of Administrative Claims upon the earlier of (i) a Final Order allowing such Administrative Claim, (ii) entry of an order confirming the Seller's Plan of Liquidation by the Bankruptcy Court or (iii) in the normal course of business with respect to the Accounts Payable.

v)     the assumption and/or payment of the other Assumed Liabilities set forth in Section 2.3 above as follows:

> payment of other Assumed Liabilities upon the earlier of (i) a Final Order as to such Assumed Liability, (ii) entry of an order confirming the Seller's Plan of Liquidation by the Bankruptcy Court, or (iii) in the normal course of business.

vi)     One Hundred and Fifty Thousand Dollars ($150,000) (the "Unsecured Creditor Payments") payable by quarterly payments over the course of three (3) years to the holders of allowed unsecured claims against the Seller in the Bankrutpcy Case. The Unsecured Creditor Payments will be payable from collection of the Excluded Accounts Receivable, but in the event an insufficient amount of Exluded Accounts Receivable has been collected by the due date of a quarterly payment, the Buyer shall make the Unsecured Creditor Payment for that quarter. To the extent collection of the Excluded Accounts Receivable exceeds One Hundred and Fifty Thousand Dollars ($150,000) (after repayment to the Buyer for any Unsecured Creditor Payments which it has made), the additional collected amounts will be paid to holders of allowed unsecured claims.

(b)    The Parties agree that the Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Assets in accordance with Section 1060 of the Code and the treasury regulations thereunder (and any similar Law, as appropriate) (the "Allocation"). The Seller shall timely and properly prepare, execute, file and deliver all such documents, forms and other information as the Buyer may reasonably request to prepare

such Allocation. The Buyer shall deliver the Allocation to the Seller for review and comment within ninety (90) days before the due date of the tax returns which include such Allocation. The Buyer and the Seller agree to cooperate in good faith to resolve any dispute regarding the Allocation. The Buyer and the Seller, and their respective Affiliates, shall report, act and file all tax returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all income tax purposes consistent with such Allocation. If the Parties are unable to resolve any material differences with regard to the allocation of the Purchase Price among the Assets, then any disputed matters shall be finally and conclusively determined by an independent certified accounting firm or independent certified appraisal firm, which firm shall be mutually agreed to by the Buyer and the Seller. Promptly, but not later than fifteen (15) Business Days after its acceptance of appointment hereunder, such firm shall determine (based solely on presentations by the Seller and the Buyer and not by independent review) only those matters in dispute and shall render a written report as to the disputed matters and the resulting allocation of the Purchase Price, which report shall be conclusive and binding upon the Parties. In this regard, the Parties agree that, to the extent required, all tax returns or other tax information they may file or cause to be filed with any Governmental Authority shall be prepared and filed consistently with such report. The fees and expenses of such independent firm shall be borne by the Buyer.

(c)    Seller waives the necessity for any deposit from the Buyer; provided, however, that such waiver shall not prejudice the right of Seller to request a deposit from any competing bidder.

2.6    **As Is**. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE ASSETS "AS IS" AND "WHERE IS," "WITHOUT RECOURSE," AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE QUALITY, PHYSICAL CONDITION, EXISTENCE, LOCATION, OR VALUE OF THE ASSETS, THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES IN, ON, UNDER OR ABOUT THE ASSETS, OR THE INCOME OR EXPENSES FROM OR OF THE HOSPITAL AT THE PURCHASED PREMISES OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS, THE USE RESTRICTIONS AFFECTING THE ASSETS, THE ENFORCEABILITY OF ANY CONTRACT OR OTHER AGREEMENT OR RIGHT ASSIGNED HEREUNDER, OR THE COMPLIANCE OF THE ASSETS OR ANY PART THEREOF WITH ANY LAWS, STATUTES, RULES, ORDINANCES, DECREES OR ORDERS APPLICABLE THERETO. WITHOUT LIMITING THE FOREGOING, IT IS UNDERSTOOD AND AGREED THAT SELLER MAKES NO WARRANTY OF HABITABILITY, SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE.

Buyer acknowledges that Buyer is purchasing the Assets based solely upon Buyer's own independent investigations and findings and not in reliance upon any information provided by Seller or Seller's agents or representatives. Seller shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Assets, furnished by any agent, employee, or other person representing or purporting to represent Seller. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**2.7    Closing Statement**

(a)    Prior to the Closing Date, Seller shall prepare and shall deliver to Buyer not less than five (5) Business Days prior to the Closing Date a closing statement (the "Closing Statement") related to the Transaction.

(b)    Buyer agrees that there shall be no proration of any customarily proratable items and no purchase price adjustments.

(c)    Seller shall (i) consult with Buyer and its representatives with respect to the Closing Statement and (ii) permit Buyer and its representatives to review Seller's work papers relating thereto. Buyer may object to any of the information contained in the Closing Statement by delivering written notice of such objections to Seller not less than two (2) Business Days after receipt of the Closing Statement. If Buyer timely raises any such objections prior to the Closing, Buyer and Seller shall attempt to resolve such objections in good faith prior to the Closing Date; provided, however, that to the extent Buyer and Seller are unable to resolve such issues prior to the Closing, then, absent manifest error, the parties shall use Seller's calculation as reflected in the Closing Statement for purposes of determining the Purchase Price.

## ARTICLE III
## CLOSING

**3.1    Closing.** The consummation of the sale and purchase of the Assets and the other transactions contemplated by and described in this Agreement (the "Closing") shall take place at the offices of Stichter Riedel Blain & Prosser, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602, at 10:00 a.m. local time on the day which is no later than two (2) Business Days following the satisfaction or waiver by the appropriate party of all the conditions precedent to Closing specified in Articles VIII and IX hereof, or at such later date and/or at such other location as the parties hereto may mutually designate in writing (the "Closing Date"). The Closing shall be deemed to occur at 12:01 a.m., Eastern Standard Time, on the Closing Date (the "Effective Time").

**3.2    Actions of Seller at Closing.** At the Closing and unless otherwise waived in writing by Buyer, Seller shall deliver to Buyer the following:

(a)    a warranty deed or deeds in recordable form dated as of the Closing Date (the "Deed"), conveying to Buyer or Buyer's designee good and marketable title to the Real Property owned by Seller in fee simple, free and clear of any Lien, easement, restriction of record, including any use restriction, or other encumbrance, except for the Permitted Encumbrances, duly executed by Seller and in form and substance reasonably satisfactory to Buyer;

(b)    The Sale Order, which shall be a Final Order, and shall release all Liens (other than the Permitted Encumbrances) encumbering any of the Assets;

(c)     A Bill of Sale, duly executed by Seller, in form and substance reasonably satisfactory to Buyer and Seller (the "Bill of Sale"), conveying to Buyer good and marketable title to all tangible assets which are a part of the Assets and valid title to all intangible assets which are a part of the Assets, free and clear of all Liens other than the Permitted Encumbrances;

(d)     The Title Policy as described in and provided by Section 8.5 hereof;

(e)     Copies of resolutions duly adopted by the board of directors of Seller authorizing and approving the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of Closing by the appropriate officers of Seller;

(f)     Certificates of the President or a Vice President of Seller and in form and substance satisfactory to Buyer certifying that each and all of the conditions set forth in Article VIII have been satisfied;

(g)     Certificates of incumbency for the respective officers of Seller executing this Agreement or making certifications for Closing or executing agreements or instruments contemplated hereby dated as of Closing;

(h)     Certificates of existence and good standing of Seller from the State of Florida dated the most recent practical date prior to Closing;

(i)     An assignment (the "Assignment"), in form and substance reasonably satisfactory to Buyer and Seller, duly executed by Seller conveying all of Seller's interests in the Assumed Contracts to Buyer;

(j)     An agreement regarding the assumption by the Buyer of the Assumed Liabilities (the "Assumption Agreement"), in form and substance reasonably satisfactory to Buyer and Seller;

(k)     The Closing Statement with respect to the payment in cash to be made by the Buyer at the Closing; and

(l)     Such other instruments and documents as Buyer reasonably deems necessary to effect the transactions contemplated hereby, which Buyer will make its best efforts to provide to five (5) days prior to Closing.

**3.3     Actions of Buyer at Closing.** At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver to Seller the following:

(a)     An amount in immediately available funds equal to (i) the amount equal to the allowed Administrative Claims (excluding Accounts Payable), plus (ii) Closing Costs plus (iii) Transfer Taxes, if any, plus (iv) the amount of the PMATF Tax (unless such amount is paid by Buyer pursuant to payment terms), plus (v) any amounts other than PMATF Tax due to

AHCA that Buyer is legally obligated to assume (unless such amount is paid by Buyer pursuant to payment terms) (collectively, the "Cash Payment");

(b)    The Bill of Sale, duly executed by Buyer;

(c)    The Assignment, duly executed by Buyer;

(d)    The Assumption Agreement, duly executed by Buyer;

(e)    The Closing Statement, duly executed by Buyer;

(f)    Copies of resolutions duly adopted by the board of directors of Buyer authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of Closing by an appropriate officer of Buyer;

(g)    Certificates of the President or a Vice President of Buyer and in form and substance satisfactory to Seller certifying that each and all of the conditions set forth in Article IX has been satisfied;

(h)    Certificates of incumbency for the respective officers of Buyer executing this Agreement or making certifications for Closing or executing agreements or instruments contemplated hereby dated as of Closing;

(i)    Certificates of existence and good standing of Buyer from the state of its incorporation, dated the most recent practical date prior to Closing; and

(j)    Such other instruments and documents as Seller reasonably deems necessary to effect the transactions contemplated hereby, which Seller will make its best efforts to provide to five (5) days prior to Closing.

**3.4    Section 1146(a) Exemption.** The transfer of the Assets (including the Real Property), as contemplated by this Agreement, shall be accomplished pursuant to and in contemplation of the Plan of Liquidation to be filed with the Bankruptcy Court. As a result thereof, pursuant to Section 1146(a) of the Bankruptcy Code, the transfer of the Assets (including the Real Property) hereunder is not subject to state transfer taxes, including, without limitation, documentary stamp taxes. The parties agree to include a provision in all instruments transferring title to any Assets with restates the exemption provided by Section 1146(a) of the Bankruptcy Code.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and as of the Closing Date, Seller represents and warrants to Buyer the following:

**4.1    Corporate Capacity.**

Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Subject to the entry of the Sale Order, Seller has the requisite power and authority to enter into this Agreement and the Transaction Documents, and perform its obligations thereunder.

**4.2    Corporate Powers.**  Subject to the entry of the Sale Order, Seller's execution, delivery and performance of this Agreement and all other agreements referenced herein or ancillary hereto to which it is a party, and Seller's consummation of the transactions contemplated hereby or thereby are within its corporate powers and are not in contravention of the terms of its articles of incorporation, bylaws, and have been approved by all requisite corporate action.

**4.3    Title to Assets.**  The Seller has good, marketable and indefeasible title to all of the Assets.  Upon the sale, assignment, transfer and delivery of the Assets to the Buyer under this Agreement and the related sale documents, there will be vested in the Buyer good, marketable and indefeasible title to the Assets, free and clear of all Liens whatsoever other than the Permitted Encumbrances.

**4.3    Binding Agreement.**  Subject to the entry of the Sale Order, this Agreement has been and, on the Closing Date, all of the agreements and documents to which Seller shall be a party in connection with this Agreement shall have been, duly executed and delivered by Seller, and shall be the valid and legally binding obligation of Seller, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**4.4    Legal Proceedings.**  Except as disclosed in the Seller's Bankruptcy Schedules or otherwise known to the Buyer, there is no Proceeding or Order pending or, to the knowledge of Seller, threatened against or affecting Seller or any of its properties or rights.  Seller expressly represents and warrants that, to its knowledge, there are no Procedings or Orders currently pending that challenge or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with or increasing the costs of any of the transactions contemplated by this Agreement.  To the knowledge of Seller, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**4.5    Brokers and Finders.**  Neither Seller nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Seller the following:

**5.1** **Corporate Capacity.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has the requisite power and authority to enter into this Agreement and the Transaction Documents, perform its obligations hereunder and to conduct its businesses as now being conducted.

**5.2** **Corporate Powers; Consents; Absence of Conflicts With Other Agreements.** Buyer's execution, delivery and performance of this Agreement and all other agreements referenced in or ancillary hereto to which Buyer is a party, and Buyer's consummation of the transactions contemplated hereby or thereby:

(a)    are within Buyer's limited liability company powers and are not in contravention of the terms of Buyer's articles of organization or operating agreement and have been approved by all requisite limited liability company action;

(b)    has been or will be approved by or consented to by any Governmental Authority which is required by Law or the regulations of any Governmental Authority;

(c)    shall not violate any Law to which Buyer may be subject;

(d)    shall not violate any Order of any court or Governmental Authority to which Buyer may be subject;

(e)    shall not render Buyer insolvent or otherwise unable to pay its debts as they become due; and

(f)    are not subject to any financing contingencies.

**5.3** **Binding Agreement.** Subject to the entry of the Sale Order, this Agreement has been and, at the Effective Time, all of the agreements and documents to which Buyer is a party in connection with this Agreement shall have been duly executed and delivered by Buyer, and shall be the valid and legally binding obligation of Buyer, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**5.4** **Legal Proceedings.** There is no Proceeding or Order pending or, to the knowledge of Buyer, threatened against or affecting Buyer or any of its properties or rights that challenges or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with any of the transactions contemplated by this Agreement. To the knowledge of Buyer, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**5.5** **Brokers and Finders.** Neither Buyer nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.

## ARTICLE VI
## COVENANTS OF SELLER

**6.1    Bankruptcy Court Approval.**

(a)    Seller shall use its best efforts to gain approval by the Bankruptcy Court of the Transaction, to the fullest extent required by Section 363 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules within sixty (60) days following execution of this Agreement. Immediately following the execution and delivery of this Agreement, but in no event later than ten (10) days following execution of this Agreement, Seller shall file a motion with the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, seeking, the entry of an order approving certain bid procedures and bid protections in connection with the sale of the Assets ("Sale Procedure Order"). Within twenty (20) days following the execution and delivery of this Agreement, Seller shall file a motion with the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer, seeking entry of an order approving the sale of the Assets to the Buyer and the Transaction ("Sale Motion").

(b)    The Sale Procedure order shall prescribe the procedures that shall govern an auction sale of the Assets, including but not limited to (i) the deposit of $100,000 that prospective bidders must deposit in order to qualify to bid at the auction sale; (ii) the nature of financial information that prospective bidders must submit to establish their financial capacity to consummate a successful bid; (iii) the nature of the notice that must be disseminated to parties in interest; (iv) the minimum upset bid required to start the auction sale which in any event shall be no less than $100,000 above the Purchase Price (the "Initial Upset Bid"); (v) the payment of the Termination Fee described in Section 10.2 of this Agreement; (vi) the timetable for bidders to conduct due diligence, Seller to file the Sale Motion, and the last day to file upset bids which in any event shall be at least five (5) days prior to a hearing on the Sale Motion; and (vii) following an Initial Upset Bid, the incremental amount by which each bid must exceed the prior bid, which amount shall be $100,000.

(c)    Promptly after the filing of the Sale Motion, Seller shall use reasonable best efforts to obtain a hearing thereon at the earliest permissible date, but in no event shall such hearing be later than sixty (60) days following the execution of this Agreement, unless a shorter notice period is approved by the Bankruptcy Court. Upon obtaining a hearing date, Seller shall give notice of the Sale Motion and the hearing thereon as and when required by applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. This Agreement, the Sale Motion and the Transaction shall be subject to the Sale Procedure Order and the Sale Order. Buyer acknowledges and agrees that if Buyer is not the high bidder for the Assets under the Sale Procedure Order, the Assets shall not be sold to Buyer and this Agreement shall terminate with no liability to Seller except as expressly set forth in Section 8.2.

**6.2    Seller's Cost Reports.** Seller, at the Buyer's expense, shall timely prepare and timely file all cost reports relating to Seller for periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions set forth herein, including terminating cost reports for the Medicare, Medicaid and TRICARE programs (the "Seller Cost Reports"). Buyer shall forward to Seller any and all correspondence relating to Seller Cost

Reports within five (5) Business Days after receipt by Buyer. Seller shall retain all rights to agency settlements and to Seller Cost Reports including any amounts receivable or payable in respect of such reports or reserves relating to such reports. Such rights shall include the right to appeal any Medicare determinations relating to agency settlements and Seller Cost Reports. Seller shall retain the originals of Seller Cost Reports, correspondence, work papers and other documents relating to Seller Cost Reports and the agency settlements. Seller shall furnish copies of such documents to Buyer prior to the Closing to the extent then existing.

**ARTICLE VII**
**COVENANTS OF BUYER; ADDITIONAL AGREEMENTS**

7.1    **Confidentiality.** Buyer shall, and shall use its reasonable best efforts to cause its employees, representatives and agents to, hold in confidence, as if it were confidential information of Buyer, all Confidential Information, unless compelled to disclose such infonnation by judicial or administrative process or, in the opinion of counsel, by other legal requirements, and Buyer shall not disclose Confidential Information to any Person, except as otherwise may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer. If this Agreement is terminated, then upon Seller's written request, Buyer shall within twenty (20) days return or cause to be returned to Seller all documents and all copies thereof furnished by Seller and held by Buyer, its representatives or agents containing such Confidential Information. Buyer recognizes that any breach of this Section would result in irreparable harm to Seller and that therefore Seller shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies.

7.2    **Post-Closing Access to Information.**    Seller and Buyer acknowledge that subsequent to Closing each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, the prosecution or defense of third-party claims, and matters in the Bankruptcy Case. Accordingly, Seller and Buyer agree that until the later of the seventh anniversary of the Effective Time or the expiration of any applicable statute of limitations pertaining to Medicare, Medicaid, TRICARE or tax matters, to the extent permitted by Law each shall make reasonably available to the other's agents, independent auditors and/or governmental agencies upon written request and at the expense of the requesting party such documents and information as may be available relating to the Assets for periods prior and subsequent to Closing to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, the prosecution or defense of claims, and matters in the Bankruptcy Case. In addition, Seller shall make available to Buyer, at Buyer's cost and expense, upon reasonable notice and during normal business hours, Seller's books and records to the extent not transferred to Buyer but necessary or of assistance to Buyer in the preparation of cost reports, financial records, Tax Returns or like matters.

7.3    **Preservation and Access to Records After the Closing.** After the Closing, Buyer shall, in the ordinary course of business and as required by Law, keep and preserve all

22

medical records and other records of the Hospital, including personnel records required under 29 CFR § 1910.1030(h) relating to exposure to blood borne pathogens, existing as of the Closing and which constitute a part of the Assets delivered to Buyer at Closing. Buyer acknowledges that as a result of entering into this Agreement and operating the Hospital it shall gain access to patient and other information which is subject to rules and regulations concerning confidentiality. Buyer agrees to abide by any such rules and regulations relating to the Confidential Information it acquires. Buyer agrees to maintain the patient records delivered to Buyer at Closing at the Hospital after Closing in accordance with Law, and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated at the Hospital after Closing. Upon reasonable notice, during normal business hours, at Seller's sole cost and expense and upon Buyer's receipt of appropriate consents and authorizations, Buyer shall afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and, as reasonably requested, copies of, the records transferred to Buyer at the Closing (including access to patient records in respect of patients treated by Seller at the Hospital). Any access to the Hospital, its records or Buyer's personnel granted to Seller in this Agreement shall be upon the condition that any such access not materially interfere with the business operations of Buyer.

    7.4    **Collection Procedures for Excluded Accounts Receivable.**    Seller hereby appoints Buyer, and Buyer agrees to act, as Seller's collection agent with respect to the Excluded Accounts Receivable which has not been received prior to the Closing Date. Buyer shall remit all collected Excluded Accounts Receivable required to be paid over to the Seller pursuant to this Section 7.4 within ten (10) days following the month during which Buyer receives such Excluded Accounts Receivable by depositing such amounts into an account specified in writing by Seller.

    7.5    **Employment.** As of the Effective Time, the Seller shall terminate all of its employees and the Buyer shall offer employment effective as of the Effective Time to such employees of the Seller who are specifically identified on Schedule 4 attached hereto on terms and conditions determined by the Buyer in its sole and absolute discretion. Notwithstanding any other term of this Agreement to the contrary, the Buyer shall deliver to the Seller a completed Schedule 4 at least five (5) days prior to the Closing. Such employees who accept the Buyer's offer of employment shall be referred to herein as the "Transferred Employees". To facilitate the Buyer's obligations under this Section 7.5, upon request, the Seller shall provide the Buyer, within a reasonable period prior to the Closing, a true and correct list of all of its employees, including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment. With respect to the Transferred Employees, after the Effective Time, the Buyer shall be responsible for all liabilities, obligations and commitments of the Buyer and its Affiliates relating to all wages, salaries, bonuses, vacation, sick leave and other forms of compensation and related expenses, workers' compensation claims, and employee benefit liabilities under any and all plans, programs and arrangements maintained or contributed to by the Buyer and its Affiliates for the benefit of the Transferred Employees, if and to the extent incurred or accrued after the Effective Time. The Seller shall have no responsibility whatsoever for any liabilities or obligations that relate in any way to such Transferred Employees' employment with the Buyer or any subsequent termination of employment of any Transferred Employee by the Buyer. As provided in Section 2.3, the Buyer

shall have responsibility for all liabilities or obligations that relate in any way to such Transferred Employees' employment with the Seller prior to the Effective Time, including any liabilities or obligations related to the termination of employment of such Transferred Employees by the Seller.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

The obligations of Buyer hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

**8.1    Representations/Warranties.** The representations and warranties of Seller contained in this Agreement which are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case when made and on and as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date; and each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Seller prior to or as of Closing pursuant to this Agreement which are qualified as to materiality shall have been duly complied with and performed, and those not so qualified shall have been duly complied with and performed in all material respects.

**8.2    Sale Procedure Order.** Entry by the Bankruptcy Court of the Sale Procedure Order expressly approving and authorizing bid procedures and including a provision that if Buyer is not the successful bidder at the auction sale, then Seller shall pay to Buyer upon Bankruptcy Court approval of a bid of another entity as shall be determined by the Bankruptcy Court to be "a higher and better bid" than that of Buyer (the "Higher Auction Transaction") and the closing of the Higher Auction Transaction, (i) the Termination Fee specified in Section 10.2, and (ii) the Buyer Loan Obligation.  Payment of the Termination Fee shall be the sole remedy of Buyer for the failure of Seller to complete the sale of the Assets to Buyer as a result of a Higher Auction Transaction.

**8.3    Pre-Closing Confirmations.** Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that Buyer has:

(a)    received approval from all Governmental Authorities whose approval is required to complete the transactions herein contemplated;

(b)    received confirmation from AHCA as to hospital licensure matters and reasonable confirmation from all other applicable Governmental Authorities that upon Closing all licenses and permits required by Law to operate each component of the Hospital as currently operated will be transferred to, or reissued in the name of Buyer;

(c)    obtained reasonable assurances that Medicare and Medicaid certification of the Hospital for its operation by Buyer shall be effective as of Closing and that Buyer may participate in and receive reimbursement from such programs effective as of Closing;

24

(d)    obtained such consents and approvals as may be legally or contractually required for Buyer's consummation of the transactions described herein; and

(e)    approved the amount and the payment terms of any and all liabilities for any and all Taxes and any related interest, fines, costs or penalties due to any federal or state taxing authority.

**8.4    Sale Order.** Entry by the Bankruptcy Court of the Sale Order consistent with this Agreement, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and otherwise in procedure, form and substance reasonably satisfactory to Buyer, and the Sale Order shall be a Final Order.

**8.5    Title Policy.** On or before the Closing Date, Buyer will obtain at its expense a current title commitment (the "Title Commitment") issued by a title agent selected by Buyer (the "Title Agent") shall provide a copy of such Title Commitment, together with legible copies of all exceptions to title referenced therein, to Seller. The Title Commitment shall contain the express commitment for the issuance of a title policy (the "Title Policy") to Buyer. The Title Commitment and Title Policy shall be satisfactory to Buyer in all reasonable respects.

**8.6    Closing Documents.** Seller shall have executed and delivered to Buyer all of the items required to be executed by Seller as contemplated by Section 3.2 or otherwise pursuant to any term or provision of this Agreement.

**8.7    FIRPTA.** Seller shall have delivered to Buyer a non-foreign affidavit dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that no Seller is a "foreign person" as defined in Section 1445 of the Code.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Seller:

**9.1    Representation/Warranties.** The representations and warranties of Buyer contained in this Agreement which are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case when made and as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date; and each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Buyer prior to or as of the Closing pursuant to this Agreement which are qualified as to materiality shall have been duly complied with and performed, and those not so qualified shall have been duly complied with and performed in all material respects.

**9.2** **Purchase Price**. Buyer shall have delivered the Cash Payment to the Seller.

**9.3** **Closing Documents**. Buyer shall have executed and delivered to Seller all of the items required to be executed by Buyer as contemplated by Section 3.3 or otherwise pursuant to any term or provision of this Agreement.

**9.4** **Action/Proceeding**. No court or any other Governmental Authority shall have issued an order restraining or prohibiting the transactions herein contemplated; and no Governmental Authority shall have commenced any action or suit before any court of competent jurisdiction or other Governmental Authority that seeks to restrain or prohibit the consummation of the transactions herein contemplated.

**9.5** **Pre-Closing Confirmations**. Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that Seller has:

(a) received approval from all Governmental Authorities whose approval is required to complete the transactions herein contemplated;

(b) obtained such other consents and approvals as may be legally or contractually required for Seller's consummation of the transactions described herein;

(c) obtained the Sale Order from the Bankruptcy Court, which order shall be a Final Order; and

(d) obtained an order from the Bankruptcy Court confirming the Plan of Liquidation.

**ARTICLE X**
**TERMINATION**

**10.1** **Termination**. Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time: (a) on or prior to the Closing Date by mutual written consent of Buyer and Seller; (b) by Buyer if any of the conditions specified in Article VIII of this Agreement to the Buyer's obligation to close has not been satisfied and shall not have been waived by Buyer; (c) by Seller if any of the conditions specified in Article IX of this Agreement to the Seller's obligations to close has not been satisfied and shall not have been waived by Seller; (d) by Buyer or Seller if a Governmental Authority whose approval is necessary to consummate the transactions contemplated hereby shall have refused to approve the transactions contemplated hereby, and such decision is nonappealable; (e) by Buyer or Seller if the Closing shall not have taken place within sixty (60) days from the date of this Agreement (which date may be extended by mutual agreement of Buyer and Seller), unless the party desiring to terminate as above provided is in default hereunder; or (f) by Seller, if Seller accepts and the Bankruptcy Court approves a Higher Auction Transaction.

**10.2** **Termination Fee and Expense Reimbursement**. Seller hereby confirms that it is critical to the process of arranging an orderly sale of the Assets to proceed by selecting

Buyer to enter into this Agreement in order to present the Bankruptcy Court with arrangements for obtaining the highest realizable price for the Assets and that, without Buyer having committed substantial time and effort to such process, Seller and Seller's estate would have to employ a less orderly process of sale and thereby incur higher costs and risk attracting lower prices. Accordingly, the contributions of Buyer to the process have indisputably provided very substantial benefit to Seller and Seller's estate, Seller acknowledges that Buyer would not have invested the effort in negotiating and documenting the transaction provided for herein and incurring the obligations to pay its outside advisors and legal counsel if Buyer were not paid the Termination Fee (as defined below). If the sale of the Assets to a purchaser other than Buyer is consummated in accordance with the Sale Procedure Order or an order of the Bankruptcy Court authorizing the sale of the Assets to another purchaser, then Seller shall pay Buyer a break-up fee equal to $75,000.00 (the "Termination Fee"). Upon entry of an order authorizing a sale of the Assets to another purchaser, Buyer shall receive a super-priority administrative claim in the amount of the Termination Fee which shall be paid to Buyer out of first proceeds immediately upon the closing of a alternative transaction with another purchaser. Seller shall pay the Termination Fee by wire transfer of immediately available funds. Seller acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, Buyer would not enter into this Agreement.

## ARTICLE XI
## GENERAL

**11.1** **Notices.** Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile and telex) or when delivered by overnight courier, or five days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested to the following address:

      (a)   If to the Seller:

            Manoj K. Prasad, M.D, President
            Cypress Health Systems Florida, Inc.
            President & Chief Executive Officer
            Tri County Hospital- Williston
            125 SW 7th Street, Williston, Florida 32696
            Phone: 352 528 2801 extn: 404
            Email: mprasad@tricountyhosp.com
            Facsimile No.: (850) 429-8644


            With a copy to:

            Elena Paras Ketchum, Esquire
            Charles A. Postler, Esquire

Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Facsimile No.: (813) 229-1811

> (b)    If to the Buyer:

Mohammad J. Tariq, MD
Regional Health Partners, LLC
1850 Lake Pointe Drive - Suite 100
Lewisville, TX  75057
Facsimile No:972-316-3322

With a copy to:

John H. Carney
One Meadows Building
5005 Greenville Avenue - Suite 200
Dallas Texas 76206
Facsimile No: 214-363-9979

or to such other address or number, and to the attention of such other Person or officer, as any party may designate, at any time, in writing in conformity with these notice provisions.

   **11.2    Public Announcements.** Each of the parties hereto mutually agrees that no party shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions contemplated hereby without the prior written consent of the other party except as required in connection with the Bankruptcy Case, information and filings reasonably necessary to be directed to Governmental Authorities to fully and lawfully effect the transactions contemplated hereby or required in connection with securities and other Laws. Nothing herein shall prohibit either party from responding to questions presented by the press or media without first obtaining prior consent of the other party.

   **11.3    Expenses, Legal Fees and Costs**

   (a)    Except as otherwise expressly set forth in this Agreement, all expenses of the preparation of this Agreement and of the purchase of the Assets set forth herein, including counsel fees and accounting fees, shall be borne by the respective parties incurring such expense, whether or not such transactions are consummated.

   (b)    Buyer shall pay subject to the Sale Order (i) all documentary stamps, Transfer Taxes, recording fees and similar closing costs, (ii) the cost of title commitments and title insurance contemplated hereunder in connection with the sale of Real Property and the consummation of the transactions contemplated hereby.

(c)     In the event either party elects to incur legal expenses to obtain a third-party enforcement or interpretation of any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including attorney's fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

**11.4    No Third-Party Beneficiary.** The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors or assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person or entity.

**11.5    Choice of Law.** The parties agree that this Agreement shall be governed by and interpreted, construed and enforced in accordance with the Laws of the State of Florida, excluding any conflicts of law rules or principles that would refer the governance or the interpretation, construction or enforcement of this Agreement to the Laws of another jurisdiction.

**11.6    Benefit/Assignment.** Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, further, that notwithstanding the foregoing, Buyer shall be entitled to assign this Agreement, without obtaining Seller's consent, to an Affiliate of Buyer.

**11.7    Waiver of Breach.** The waiver by either party of breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or other provision hereof.

**11.8    Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Seller under this Agreement shall not be materially and adversely affected thereby, (a) such provision shall be fully severable; (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this agreement a legal, valid and enforceable provision as similar in terms (including duration, area or amount) to such illegal, invalid or unenforceable provision as may be possible.

**11.9    Divisions and Headings.** The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**11.10   Drafting.** No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise

favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement

**11.11 Entire Agreement / Amendment.** This Agreement supersedes all previous contracts and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein. As between or among the parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect. The parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others. All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded hereby and no amendments or modifications hereto shall be binding unless and until made in writing and signed by all parties hereto. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. A facsimile signature shall be considered the same as an original signature for purposes of execution of this Agreement.

**11.12 Time of Essence.** Time is of the essence in the performance of this Agreement.

**11.13 Waiver of Jury Trial.** EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW. ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**11.14 Interpretation.** In this Agreement, unless the context otherwise requires: Schedules;

    (a)    references to this Agreement are references to this document;

    (b)    references to Articles and Sections are references to articles and sections of this Agreement;

    (c)    subject to the provisions of Section 9.7, references to any party to this Agreement shall include references to its respective successors and permitted assigns;

    (d)    the terms " hereof" "herein," "hereby ," and derivative or similar words will refer to this entire Agreement;

    (e)    the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural;

    (f)    references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties from time to time in accordance with Section 13.13;

30

(g)     the word "including" shall mean including without limitation;

(h)     nothing in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail and without limiting the generality of the foregoing, the mere listing, or inclusion of a copy, of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty involves the existence of the document or other item itself);

(i)     each representation, warranty and covenant contained herein shall have independent significance and, if any party hereto has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant; and

(j)     references to time are references to local Williston, Florida time.

**11.15   Further Assurances.**  On and after the Closing Date, Buyer and Seller will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including putting Buyer in possession of the Assets or to convey title to the Assets to Buyer.

**11.16   Survival.**   All representations and warranties of the Seller and the Buyer contained in this Agreement shall survive until, and expire at, the Closing. Each Party expressly agrees that neither such Party nor any Person attempting to assert or maintain a claim by or through such Party may, after the Closing, bring any claim or assert any rights with respect to the breach of any representation, warranty or covenant made by the other Party hereunder.

**11.17   Setoff.**  Buyer shall have no right or claim of setoff against the Seller, the Seller's Bankruptcy estate or the Purchase Price on account of the transactions contemplated by this Agreement, including any Assumed Liabilities or purchase of any Assets.

**11.18   Exclusive Jurisdiction.** The parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto or any of Seller's creditors or other parties in interest in the Bankruptcy Case affected hereby pertaining directly or indirectly to this Agreement or to any matter arising herefrom or related hereto; provided, however, that if the Bankruptcy Court determines that it lacks or abstains from exercising such jurisdiction the parties or creditors agree that the United States District Court for the Northern District of Florida, Gainesville Division, shall have exclusive jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date and year first above written.

**SELLER:**

WITNESSES:

Print Name: _Nancy M Davis_

Print Name: _Karla Dass_

CYPRESS HEALTH SYSTEMS FLORIDA, INC.

By: _____

Name: Manoj Prasad
Title:  Chief Executive Officer


**BUYER:**

REGIONAL HEALTH PARTNERS, LLC

Print Name: _Nancy M Davis_

Print Name: _Karla Dass_

By: _____

Name: Mohammad Tariq
Title:  PRESIDENT

Print Name: _Nancy M Davis_

Print Name: _Karla Dass_

By: _____

Name: Jalil Khan
Title:  CHAIRMAN